**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re GARY L. MASON,<br><br>Debtor, | Bankruptcy Action No. 17-18177 (MBK)<br>Adversary Proceeding No. 17-1463 (MBK) |
| GARY L. MASON,<br><br>Defendant-Appellant,<br><br>v.<br><br>HARRY BADE, et al.,<br><br>Plaintiffs-Appellees. | **ON APPEAL FROM THE<br>BANKRUPTCY COURT OF THE<br>DISTRICT OF NEW JERSEY**<br><br>**Civil Action No. 19-17772 (MAS)**<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon pro se Defendant-Appellant Gary L. Mason's ("Appellant") appeal from an Order entered by the United States Bankruptcy Court ("Bankruptcy Court") on August 28, 2019 ("August 2019 Order") declaring a certain debt non-dischargeable pursuant to 11 U.S.C. § 523(a)(4). (ECF No. 1.) Appellant filed a brief in support of his appeal (ECF No. 5), and Plaintiffs-Appellees Harry Bade ("Bade"), Alan Abraskin, Gloria Abraskin (collectively with Alan Abraskin, the "Abraskins"), Ed Grad, Marilyn Grad (collectively with Ed Grad, the "Grads"), Matthew Phillips ("Phillips"), and River Capital Associates, LLC, individually and derivatively on behalf of Numba One, LLC, (collectively, "Appellees") opposed (ECF No. 9). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth herein, Appellant's appeal is denied, and the Bankruptcy Court's August 2019 Order is affirmed.

## I. BACKGROUND

### A. Factual Background

The parties are familiar with the factual and procedural history of this matter, as well as its extensive record. The Court, therefore, recites only those facts necessary to resolve the instant appeal. Moreover, as most of these facts are not in dispute on appeal, (*see generally* Appellant's Br. 7–27, ECF No. 5; Appellees' Br. 2–26, ECF No. 9), the Court restates the background facts from the Bankruptcy Court's August 15, 2019 Memorandum Opinion.

Appellant was an attorney for the law firm Klafter & Mason, LLC ("K&M"). (Aug. 15, 2019 Bankr. Ct. Mem. Op. (hereinafter "Bankr. Op.") 3, Ex. 3 to Appellant's Br., ECF No. 5-3); *see also In re Mason*, No. 17-18177, 2019 WL 3849291, at *1 (Bankr. D.N.J. Aug. 15, 2019). In June 2006, Appellant was introduced to Michael Attardi ("Attardi"), a screen writer and aspiring film producer "who had authored and attempted to finance several film scripts." (Bankr. Op. 3.) Attardi retained K&M to represent his businesses in exchange for a 2% equity stake in several of his companies. (*Id.*) Following unsuccessful attempts to produce an animated film, Attardi began working on a comedy film titled "Numba One." (*Id.*; Appellant's Br. 9.) To finance and produce the film, on June 9, 2010, Attardi formed the Florida limited liability company, "Numba One LLC." (Appellant's Br. 9; *see also* Bankr. Op. 3.) Attardi and Appellant were the original managers of Numba One LLC, but after Attardi discovered the "Writers Guild of America would not permit him to be paid for his script as manager of the production company[,]" he resigned as manager and was replaced by Andy VanRoon ("VanRoon"). (Bankr. Op. 3.)

In late 2010, Appellees collectively invested $690,000 and became members of Numba One LLC. (*Id.* at 3, 11; *see generally* Confidential Private Offering Mem. ("Offering Mem."), Ex. 32, ECF No. 9-6.) This investment, however, came "with the understanding that the money

2

was being placed in an escrow account until the total budget amount [for the film] of $3,000,000 could be raised, [and] further provid[ed] that the money would be returned if the $3,000,000 could not be raised by September 2, 2011." (Bankr. Op. 3–4; Offering Mem. *7 ("All funds received will be deposited into a dedicated bank escrow account until the Total Minimum Offering being offered hereby is obtained. The offering will not be consummated, and all contributions of cash, will be returned . . . unless the Total Minimum Offering has been received and accepted prior to" September 2, 2011.).)[1] On November 10, 2010, the parties amended the Offering Memorandum and changed the investment termination date to January 31, 2011. (Bankr. Op. 4 n.2.) The terms regarding escrow, however, did not change. (*See id.*; *see also* Addendum to Offering Mem. *3–4, Ex. 33, ECF No. 9-7 ("In the event 'NUMBA ONE' does not commence principal photography by January 31, 2011, any or all of the investors . . . may request . . . the return of their investment[.]").) "These restrictions on the release of the invested funds confirmed the representations included in certain promotional literature prepared by Numba One [LLC] and shown to potential investors." (Bankr. Op. 4; *see also* Numba One Powerpoint, Ex. 35, ECF No. 9-8 (noting that potential investments would be "[d]eposited in [an] escrow account" and "[u]ntouched until 100% financing secured"); Numba One Bullet Overview *2, Ex. 26, ECF No. 9-4 (noting that "[a]ll private capital is being placed in an escrow account specifically designated for [the film]" and "[i]n the unforeseen event that the full balance of funding does not come together . . . no amount of the private investor funds shall be utilized").) Appellees' $690,000 investment was ultimately deposited into K&M's trust account under the name of Numba One. (Bankr. Op. 3; *see also* Numba One Bullet Overview *2 ("[e]scrow account: Klafter & Mason, LLC – Attorney Trust Account, f/b/o [Numba] One, LLC").)

---

[1] Page numbers preceded by an asterisk refer to the page number of the ECF header.

In January 2011, Appellant, Attardi, and VanRoon were introduced to Hamilton Guaranty Capital, LLC ("Hamilton"), a hedge fund represented by the Ferguson Law Group, P.C. ("Ferguson"), and Atlantic Gulf Oil Holdings, Inc. ("Atlantic Gulf"). (Bankr. Op. 4–5.) At the time of these introductions, Hamilton and Atlantic Gulf were negotiating the terms of a Financial Services Agreement ("FSA"). (*Id.*) Pursuant to the FSA, Hamilton planned to issue Atlantic Gulf a $50 million Standby Letter of Credit (the "LOC") in exchange for $7.34 million in fees and collateral in Atlantic Gulf's oil refineries. (*Id.* at 5.) An Atlantic Gulf vice president represented to Appellant that the corporation planned to "use the proceeds [of the LOC] to purchase additional oil-related assets." (*Id.*) To finalize the FSA, however, "Hamilton required a deposit in order to invest the time and assets necessary to put together the backing for the [LOC], since [it] was said to be a complex, structured financing transaction." (*Id.*) It was suggested that Numba One LLC provide the $690,000 in K&M's trust account as the deposit. (*See id.*) On January 21, 2011, pursuant to an escrow agreement, Appellant transferred the $690,000 to Ferguson's trust account. (*Id.* at 6; *see also* Depositor Acknowledgment *1, Ex. 39, ECF No. 9-12.)[2] Importantly, the FSA included two provisions relevant to Numba One LLC. Pursuant to the first provision, "the $690,000 would be returned to Numba One [LLC] if Hamilton failed to issue a pre-advice[,]" a document "advising Atlantic Gulf that it was ready to issue the" LOC. (Bankr. Op. 5; FSA *13, Ex. 38, ECF No. 9-11.) Pursuant to the second provision, the $690,000 would be transferred "to Hamilton in the event of Atlantic Gulf's failure to timely issue the fee guarantee in favor of Hamilton." (Bankr. Op. 5; FSA *2.)

---

[2] Although the Depositor Acknowledgment indicates that the transfer of funds occurred on January 25, 2011, (*see* Depositor Acknowledgment *1), the parties stipulated at trial that the transfer occurred on January 21, 2011, (*see* June 12, 2019 Trial Tr. 62:3-25, Ex. 1 to Appellant's Br., ECF No. 5-1).

4

On January 27, 2011, Phillips, unaware of the FSA transaction, requested Appellant return the funds for himself, the Grads, and the Abraskins. (Bankr. Op. 6; Jan. 27, 2011 E-Mail Correspondence ("Jan. 27 E-Mail") *2, Ex. 48, ECF No. 9-15.) Appellant informed Phillips of the FSA, to which Phillips responded "I wish you would have discussed this with me first. Everyone knew that if we didn't have the funding by [February 1st] then a refund would be forthcoming." (Jan. 27 E-Mail *1–2.) Appellant asserted that he believed he was authorized to utilize Appellees' funds in connection with securing funding for the Numba One film, "provided that safeguards were in place to recapture those funds if the funding did not come through." (*Id.* at *1.) Appellant also offered to contact Ferguson and instruct the law firm to return the funds, but advised Phillips "to allow at least another 7-10 days for this hedge fund deal to play out because they are the real thing, and if they can fund our budget I would hate to lose those funds[.]" (*Id.*) On a subsequent January 31, 2011 conference call, Appellant, Attardi, and VanRoon, "explained the structure of the transaction to Phillips and Scire." (Bankr. Op. 6.) "During that call, [Appellant] claims to have emailed the FSA to Phillips and Scire for review[,]" but Phillips and Scire denied "receiving the FSA until months later." (*Id.*)

On February 2, 2011, after receiving a request from Ferguson, Appellant "affirmatively acknowledged" that the funds in escrow with Ferguson were being "pledged for the transaction," thereby subjecting Appellees' $690,000 to the terms of the FSA. (*Id.*) On February 7, 2011, Phillips contacted Appellant to tell him "he was becoming concerned about the risks associated with the transaction" and "would be more comfortable if the funds were held in [Ferguson's] trust account until Hamilton issued the" LOC. (*Id.* at 6.) Appellant informed Phillips he did not think this was possible after the February 2, 2011 acknowledgement. (*Id.* at 6–7.) Appellant "further advised Phillips that he could find a local law firm in Texas to file an order to show cause in an attempt to stop the transaction while trying to work through its details." (*Id.* at 7.) Phillips,

5

however, declined to pursue legal action and instructed Appellant to "wait and see how things played out after [Appellant] spoke with" Ferguson. (*Id.*) Ferguson replied to Appellant's subsequent e-mail correspondence by stating that "it was merely an escrow agent and could not speak to the structure of the transaction." (*Id.*) Appellant attempted to contact Hamilton directly, but did not receive a response. (*Id.*)

On February 9, 2011, "Hamilton issued the pre-advice in accordance with the terms of the FSA." (*Id.*) Atlantic Gulf, however, failed to issue the fee guarantee in accordance with the agreement and Ferguson, accordingly, "as escrow agent, delivered the $690,000 to Hamilton. K&M demanded return of the $690,000, but Hamilton and Atlantic Gulf refused." (*Id.*)

### B. Procedural History

On August 14, 2013, Appellees filed a complaint against Appellant, K&M, and Hamilton in the Superior Court of New Jersey, Law Division, Monmouth County, alleging that Appellant and K&M were negligent in the handling of their $690,000 investment in Numba One LLC. (*Id.*) On October 31, 2016, the Superior Court entered a consent judgment against Appellant in the amount of $890,000. (*See generally* Consent J., Ex. 1, ECF No. 9-1.)

On April 21, 2017, Appellant filed for bankruptcy under chapter 7 of the Bankruptcy Code. (Bankr. Op. 7; Bankr. No. 17-18177 (MBK).) Appellees, however, filed an adversary proceeding for a determination of dischargeability pursuant to 11 U.S.C. § 523 of the Bankruptcy Code. (*See generally* Compl., ECF No. 1, Bankr. No. 17-1463 (MBK).) Appellees alleged they entrusted their money to Appellant and K&M, only for it to be "transmitted . . . to a third party without prior authorization to do so and in direct contravention of" their agreement. (*Id.* ¶¶ 2–3.) Moreover, Appellees asserted Appellant owed them a fiduciary duty pursuant to his status as a managing member of Numba One LLC and by holding the funds in question in K&M's client trust account.

(*Id.* ¶¶ 9, 11, 13–14.) Appellees, accordingly, asserted that the debt Appellant owed them was non-dischargeable pursuant to §§ 523(a)(2), (4), and (6). (*Id.* ¶¶ 119–163.)

The Bankruptcy Court conducted a trial on June 12 and 13, 2019, hearing testimony from Appellant, Bade, Phillips, Scire, and Appellant's wife. (Bankr. Op. 7–8.) At the conclusion of trial, Appellees' causes of action stemming from §§ 523(a)(2) and (6) were dismissed. (*Id.* at 8.) The Bankruptcy Court held that Appellant owed Appellees a fiduciary duty "as a managing member of Numba One [LLC] and also in his capacity as escrow agent." (*Id.* at 10.) Furthermore, the court held that Appellant committed defalcation by "surrendering [Appellees'] funds in connection with a dubious investment transaction—without authorization, and without any meaningful examination of the transaction or the parties associated therewith." (*Id.* at 11.) The Bankruptcy Court, accordingly, held that "the debt arising from the unauthorized release of the $690,000 entrusted to [Appellant] is not dischargeable pursuant to § 523(a)(4)." (*Id.* at 14.) The instant appeal followed.

## II. LEGAL STANDARD

A district court has appellate jurisdiction over a bankruptcy court's final judgments, orders, and decrees. *See* 28 U.S.C. § 158(a). The standard of review for bankruptcy court decisions "is determined by the nature of the issues presented on appeal." *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 157 (D.N.J. 2005). Findings of fact are reviewed under a clearly erroneous standard, where factual findings may only be overturned "when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *In re CellNet Data Sys., Inc.*, 327 F.3d 242, 244 (3d Cir. 2003) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Legal conclusions, on the other hand, are subject to de novo, or plenary, review by the district court. *See Donaldson v. Bernstein*, 104 F.3d 547, 551 (3d Cir. 1997). If it is alleged that the bankruptcy court abused its discretionary authority, the

district court may only inquire whether the bankruptcy court's decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *Int'l Union, UAW v. Mack Trucks Inc.*, 820 F.2d 91, 95 (3d Cir. 1987).

## III. DISCUSSION

"It is well established that a creditor objecting to the dischargeability of a debt bears the burden of proving, by a preponderance of the evidence, that the particular debt falls within one of the exceptions to discharge enumerated in 11 U.S.C. § 523(a)." *In re Sternberg*, No. 09-2514, 2010 WL 988550, at *3 (D.N.J. Mar. 12, 2010) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)). At issue presently is § 523(a)(4), which provides that "a discharge under . . . this title does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity[.]" 11 U.S.C. § 523(a)(4). Accordingly, to prove that Appellant's debt is non-dischargeable under § 523(a)(4), Appellees must show that: "(1) there was a pre-existing fiduciary relationship between the debtor and the creditor; (2) [the] debtor acted in violation of that relationship; and (3) the creditor suffered an economic loss as a consequence." *In re Hilton L. Stein, LLC*, No. 02-36276, 2011 WL 1299985, at *5 (Bankr. D.N.J. Apr. 4, 2011) (internal quotation marks omitted) (quoting *In re Baillie*, 368 B.R. 458, 469 (Bankr. W.D. Pa. 2007)).

Appellant argues that the Bankruptcy Court erred in finding that (1) a fiduciary relationship existed between Appellant and Appellees, (Appellant Br. 29–34); (2) Appellant's conduct amounted to a defalcation, (*id.* at 34–44); and (3) Appellant had the requisite state of mind for defalcation, (*id.* at 44–47). The Court will address each argument in turn.

### A. Fiduciary Capacity

"The phrase 'while acting in a fiduciary capacity' has been the subject of several historical Supreme Court opinions and has developed a particular meaning from the earliest days of United States bankruptcy law." *In re Casini*, 307 B.R. 800, 816 (Bankr. D.N.J. 2004). In *In re Kaczynski*,

8

188 B.R. 770, 773–74 (Bankr. D.N.J. 1995), the bankruptcy court summarized "fiduciary capacity" and the related analyses as follows:

> The scope of the term "fiduciary" under § 523(a)(4) is a question of federal law. Analysis of state law, however, is necessary to determine when the requisite trust relationship exists. The traditional definition of "fiduciary," involving a relationship of confidence, trust[,] and good faith, is too broad for the purposes of bankruptcy law. Rather, the meaning of "fiduciary" for purposes of [§] 523(a)(4) is limited to instances involving express or technical trusts. Moreover, the trustee's duties must be independent of any contractual obligation between the parties and must be imposed prior to, rather than by virtue of, any claim of misappropriation. Accordingly, implied or constructive trusts and trusts ex maleficio are not deemed to impose fiduciary relationships under the Bankruptcy Code. The reason for this narrow interpretation is to promote the Bankruptcy Code's "fresh start" policy.
>
> There are different requirements that must be met to establish the existence of either an express or technical trust. To establish an express trust three elements must be met: (1) a declaration of trust; (2) a clearly defined trust res; and (3) an intent to create a trust relationship. The definition and scope of a technical trust, however, is difficult to determine. Some courts have determined that technical trusts for purposes of § 523(a)(4) can be created by state statutes. Other courts have found that state common law can create the requisite fiduciary relationship. Notwithstanding the differences in the means of establishing these two types of trusts, the scope of technical and express trusts is "not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law."

(internal citations omitted). Accordingly, the term "fiduciary" is "limited to instances involving express or technical trusts which were *imposed before* and *without reference to* the wrongdoing that caused the debt." *In re D'Urso*, No. 05-22274, 2013 WL 3286222, at *6 (Bankr. D.N.J. June 27, 2013) (emphasis added).

First, the Court rejects the Bankruptcy Court's holding to the extent it found a technical trust arose from Appellant's status as a managing member of Numba One LLC. The Florida statute the Bankruptcy Court cites for this finding has been rejected throughout Florida bankruptcy courts

9

as a means to establish a technical trust. *See, e.g., In re Grosman*, No. 05-10450, 2007 WL 1526701, at \*16 (M.D. Fla. May 22, 2007) ("Nevertheless, the type of fiduciary duties specified for managing members of a limited liability company in Florida Statute 608.4225 does not create the extraordinary level of fiduciary duty needed to make a debt non-dischargeable under Section 523(a)(4)[.]"). The Court does, however, find an express trust between the parties that gives rise to a fiduciary relationship under § 523(a)(4).

As stated previously, "[t]o establish an express trust[,] three elements must be met: (1) a declaration of trust; (2) a clearly defined trust res; and (3) an intent to create a trust relationship." *In re Kaczynski*, 188 B.R. at 774; *see also In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1064–65 (3d Cir. 1993) (Nygaard, J., concurring) ("A trust is defined as a fiduciary relationship with respect to property, subjecting the person with legal title to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an *intention* to create it." (internal quotation marks and citation omitted)). Here, pursuant to the terms of the Offering Memorandum, the parties declared that Appellees' $690,000 was to be deposited into Appellant's law firm's trust account and remain in escrow until funding for the Numba One film was complete. (Offering Mem. \*7 ("All funds received will be deposited into a dedicated bank escrow account until the Total Minimum Offering being offered hereby is obtained.").) The record also indicates that the parties intended to create this trust-like relationship. For example, materials shown to potential Numba One LLC investors, including Appellees, represented that investment funds were to be held in escrow and untouched until the Numba One film obtained its full funding. (Numba One Powerpoint (potential investments would be "[d]eposited in [an] escrow account" and "[u]ntouched until 100% financing secured"); Numba One Bullet Overview \*2 ("All private capital is being placed in an escrow account specifically designated for [the film].").) Moreover, after being informed of the FSA and transfer of funds, Phillips told Appellant that Appellees "knew

that if we didn't have the funding by [February 1st] then a refund would be forthcoming." (Jan. 27 E-Mail *1–2.) Finally, Appellant himself believed he had a trust-like fiduciary obligation to Appellees and represented the following to Attardi and VanRoon:

> I don't mean to sound harsh about this, but I am in an extremely precarious situation with respect to our investors if I don't make sure that [the] money is protected. I may technically not be counsel to those investors, but I do owe them a duty of care since I am holding their money in my trust account, and if I do anything, or fail to do something, that could be construed as negligent, and their money is lost, I will—without doubt—be sued.

(Dec. 2, 2010 E-Mail Correspondence *1, Ex. 36, ECF No. 9-9.)[3]

Although the parties never entered into a formal, explicit trust agreement, such formality is not necessary to create an express trust. *See In re Kaczynski*, 188 B.R. at 774. Importantly, express trusts can arise from "relationships in which *trust-type obligations* are imposed pursuant to statute or common law." *Id.* (emphasis added) (quoting *In re Librandi*, 183 B.R. 379, 382 (M.D. Pa. 1995)). For example, in *In re Wolfington*, 48 B.R. 920, 922 (Bankr. E.D. Pa. 1985), the debtor and creditor entered into a real estate sale. Pursuant to the agreement, the creditor's funds were placed in the debtor's corporation's account and were to be held in escrow until the final sale was consummated or terminated. *Id.* The debtor, however, withdrew the funds and used them for the corporation. *Id.* The bankruptcy court held that the "debtor's position as President, director and fifty percent (50%) shareholder of the corporation *with undisputed control over the escrow account* . . . establish[ed] the requisite fiduciary relationship between the [creditor] and the debtor." *Id.* at 923 (emphasis added); *see also Fin. Cas. & Sur. Co. v. Thayer*, 559 B.R. 102, 120 (D.N.J. 2016)

---

[3] This e-mail correspondence pertains to another transfer by Appellant of Appellees' funds. (*See* Appellant Ethics Hr'g Tr. 53:19-54:3, Ex. 67, ECF No. 9-18; *see also* Nov. 29, 2010 E-Mail Correspondence *1–2, Ex. 47, ECF No. 9-14.) It was discovered that this transaction was a fraud and Appellees' funds were wired back to K&M's trust account. (Appellant Ethics Hr'g Tr. 53:19-54:1.)

11

(finding debtor acted in fiduciary capacity where he (1) "accepted the powers of attorney granted to him by [the creditor] that imposed a fiduciary duty on [him] to act for the [creditor's] benefit" and (2) "agreed to create an express trust for [creditor's] premiums, as defined in the various provisions in the parties' agreement"). Conversely, in *In re Hartman*, 254 B.R. 669, 671–72 (Bankr. E.D. Pa. 2000), the bankruptcy court examined a loan agreement in which the debtor received a line of credit in exchange for a security interest in her inventory. The bankruptcy court rejected the creditor's argument that the security agreement in the loan created an express trust between the parties, finding that the agreement did "not set forth an intent by the parties to create a trust; nor [did] it designate an ascertainable res, trustee[,] or beneficiary." *Id.* at 673. According to the bankruptcy court, "[w]ithout separate and express trust language, the [s]ecurity [a]greement create[d] no more than a debtor/creditor relationship. Absent evidence that indicate[d] [d]ebtor held funds or specific property in trust for [the creditor], [the] court [was] unable to conclude that an express trust was created[.]" *Id.*

Here, the facts reflect that the parties entered into a trust-like agreement via the Offering Memorandum, clearly defined the trust res as Appellees' $690,000, and intended to establish trust-like obligations in which Appellant would oversee the funds until a certain date. The Court finds that these actions were sufficient to create an express trust between the parties. *See, e.g., In re Kohler*, 255 B.R. 666, 668 (Bankr. E.D. Pa. 2000) (finding debtor acted in fiduciary capacity under Pennsylvania common law after the county court found a "continuing relationship of trust existed between [the parties], that this relationship of trust existed prior to and irrespective of the wrongdoing committed by [the d]ebtor, that a trust res or property existed[,] . . . and that *characteristically fiduciary duties existed . . . above those that normally exist in an arm's length commercial relationship*" (emphasis added)). Moreover, it is undisputed that Appellant's acceptance of Appellees' $690,000 and the funds' subsequent placement into K&M's trust account

12

occurred prior to his unauthorized transfer of the funds pursuant to the FSA. The Court, therefore, concludes that an express trust was created between the parties and finds that a fiduciary relationship for the purposes of § 523(a)(4) has been established.

### B. Defalcation

In *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273–74 (2013), the Supreme Court provided the following interpretation of defalcation under § 523(a)(4):

> Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term [defalcation] requires an intentional wrong. We include as intentional not only *conduct that the fiduciary knows is improper but also reckless conduct* of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty.

(emphasis added); *see also Brown v. Konicoff*, No. 14-18373, 2018 WL 3202995, at *5 (Bankr. D.N.J. June 20, 2018) ("[T]o find recklessness, there must be evidence that the debtor was subjectively aware that his conduct might violate a fiduciary duty."). Here, the Court will affirm the Bankruptcy Court's decision regarding Appellant's defalcation in short order.

There is no dispute in the instant matter that Appellant transferred Appellees' funds to Ferguson in violation of the parties' agreement under the Offering Memorandum. (Appellant's Br. 18 ("Prior to [Phillips's January 27, 2011 e-mail correspondence], none of the [Appellees] knew about this potential financing arrangement with Hamilton and [Atlantic Gulf]."); Appellant Ethics Hr'g Tr. 57:1-8, 80:13-25.) Moreover, as the Bankruptcy Court held, the evidence demonstrates Appellant had a questionable understanding of the structure of the transfer of Appellees' funds and the FSA. (Bankr. Op. 12–13 (discussing evidence that Appellant asked Atlantic Gulf, post-transfer: "[i]n light of the language of the FSA, how are you going to make our receipt of the $4.2M and Hamilton's receipt of the $690,000 simultaneous?"); *id.* at 13 (discussing

13

correspondence between Appellant and VanRoon in which VanRoon highlighted certain risks associated with the transaction post-transfer: "what assurances do we have that [Atlantic Gulf] will provide the Fee Guarantee, beyond [its representative] indicating that he intends to do so[?]" (first alteration in original)).) By his own admission, Appellant "released [Appellees'] funds without conducting adequate due diligence regarding the legitimacy of the transaction and the credibility of the participants in said transaction." (Appellant Ethics Stipulation ¶ 127, Ex. 70, ECF No. 9-20; *see also* Mar. 22, 2011 E-Mail Correspondence *1, Ex. 40, ECF No. 9-13 (noting that Appellant "relied considerably on Hamilton and their underwriter's own due diligence" and the fact that they were unable to find anything negative on the FSA parties); *id.* ("These days, in the world of internet and scam/hoax websites, NOT finding anything negative is just as good as finding something positive.").) Finally, as mentioned earlier, Appellant represented to both Attardi and VanRoon that he had a duty of care to Appellees, stating, "I may technically not be counsel to those investors, but I do owe them a duty of care since I am holding their money in my trust account[.]" (Dec. 2, 2010 E-Mail Correspondence *1.)

Appellant, therefore, by transferring, in contravention of the parties' agreement, Appellees' funds into a dubious business transaction without proper due diligence, acted in a reckless and improper manner. *In re Wolfington*, detailed previously, is illustrative of this finding. There, the bankruptcy court found that there was "no doubt that a defalcation of trust funds occurred[,]" *id.* at 923, and held:

> The [creditor's] money was deposited into a special escrow account for a specific purpose and was not to be withdrawn until the consummation or termination of the sale agreement. The debtor, however, authorized withdrawal of these trust funds and used them for a purpose which personally benefitted him, that is, the expenses of developing [an additional real estate] property. More than a misappropriation of corporate funds was involved here. The misappropriated funds were, in fact, trust funds held in an account in the corporation's name.

14

*id.* at 925; *see also Thayer*, 559 B.R. at 120–21 ("Even accepting the bankruptcy[ court's] assessment of [debtor's] good intentions to keep his business afloat, [debtor's] intentional decision to convert for his own use premium payments that he held in trust for [creditor] meets the definition of defalcation."). Furthermore, as evinced by his e-mail correspondence to Attardi and VanRoon, Appellant was clearly subjectively aware that he maintained a duty of care to Appellees as he held their money in an escrow trust account. *See Konicoff*, 2018 WL 3202995, at *5 ("[T]o find recklessness [for defalcation], there must be evidence that the debtor was subjectively aware that his conduct might violate a fiduciary duty."). The Court, accordingly, finds that Appellant's unauthorized transfer of Appellees' funds was reckless and amounted to a defalcation. Having already found a pre-existing fiduciary relationship between the parties, and in consideration of Appellees' resulting economic loss, the Court finds that Appellant's debt arising from his unauthorized transfer of Appellees' funds is non-dischargeable pursuant to § 523(a)(4). The Court, accordingly, denies Appellant's appeal and affirms the Bankruptcy Court's August 2019 Order.

## IV. CONCLUSION

For the reasons set forth above, Appellant's appeal is denied, and the Bankruptcy Court's August 2019 Order is affirmed. The Court will enter an Order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE